UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

v. 24 Cr. 00251 (AS)

AVRAHAM EISENBERG,

Sentence

Defendant.

------------------------------x

New York, N.Y.
May 1, 2025
3:00 p.m.

Before:

HON. ARUN SUBRAMANIAN,

U.S. District Judge

APPEARANCES

JAY CLAYTON
United States Attorney for the
Southern District of New York
THOMAS BURNETT
PETER DAVIS
Assistant United States Attorney

BRIAN KLEIN
SAM TALKIN
NOAM GREENSPAN
Attorneys for Defendant

Also present: Brandon Racz, Special Agent (FBI)
Megan Henriquez, U.S. Probation Officer

THE DEPUTY CLERK: This is the matter of 23 CR 10, *United States of America v. Avraham Eisenberg*.

Can the parties, starting with counsel for the government, please state their appearance for the record?

MR. BURNETT: Good afternoon, your Honor. Tom Burnett, for the government. I'm joined here at counsel table by AUSA Peter Davis, Special Agent Branden Racz, from the FBI, and Probation Officer Specialist Megan Henriquez.

THE COURT: Good afternoon.

MR. KLEIN: Good afternoon, your Honor. Brian Klein, here with our client.

MR. TALKIN: Sam Talkin.

MR. GREENSPAN: Noam Greenspan. Good afternoon.

THE COURT: Good afternoon.

Good afternoon to you, Mr. Eisenberg.

All right. We're here for sentencing. There is an open motion for acquittal and for a new trial in one of the captioned actions, 23 CR 10. There is a non -- zero chance that I will grant that motion, in part or in full, but I need extra time to reach a final decision on the motion.

However, we have a guilty plea in 24 CR 251, and whether the motion for acquittal is granted or denied, the bulk of any sentence of incarceration I would impose would be on the charge in the '24 docketed case.

I also recognize that Mr. Eisenberg is currently at

the MDC, and I am aware of the conditions in that facility that are reflected in the defendant's documents. So, I'm prepared to proceed to sentencing on the 24 docketed case at this time. My intent would be to proceed on the charges in an ungrouped form.

So, today we would proceed to sentencing on the 24 docketed case, with the correctly calculated guidelines range on that charge. This would also obviate the issue of the acceptance of responsibility issue that was presented in the papers. Then, if a sentencing is warranted on the 23 docketed case, we would proceed on the basis of the correctly calculated guidelines range on those charges.

Now, do the parties have any objection to my proceeding in that fashion? I'll start with the government.

MR. BURNETT: No objection.

MR. TALKIN: May we just confer one second?

THE COURT: Of course.

MR. TALKIN: Thank you.

(Pause in proceeding)

MR. TALKIN: Your Honor, we're ready to proceed, as you asked.

THE COURT: Do you need any more time to discuss it with Mr. Eisenberg, or you are ready to go?

MR. TALKIN: We are ready to go. We had an opportunity to discuss it with him. Thank you.

THE COURT: All right. Hearing no objection, we will proceed.

Let me first make sure I have the materials that were submitted that are pertinent to the sentencing on the 24 docket case: A PSR December 17, 2024, and revised February 18, 2025; I have the government's submission and attachments dated April 22, 2025; Mr. Eisenberg's submission and attached letters dated March 27, 2025; I have an impact statement from Mango Markets dated April 22, 2025, though it is not relevant for today's proceeding; I also have three additional victim statements and attached materials furnished to the Court yesterday from the government.

Is there anything that I have not mentioned that is relevant here, Mr. Burnett?

MR. BURNETT: The parties just signed a consent restitution order for the three victims that you received papers for yesterday, so we can hand that up now.

THE COURT: All right. You may approach and hand it to Mr. Hernandez.

All right. Who is going to be handling the proceeding on the part of the defendant?

MR. TALKIN: I will, your Honor.

THE COURT: Mr. Talkin, have you read the PSR and discussed it with your client?

MR. TALKIN: I have.

THE COURT: Mr. Eisenberg, have you read and discussed with Mr. Talkin, or any of your other lawyers, the presentence report in this case?

THE DEFENDANT: Yes, Your Honor.

THE COURT: All right. The Court has reviewed the unresolved objections to the presentence report, and as to the objections to the factual recitation in the report, the Court determines that ruling on those objections is unnecessary, because the matter will not affect sentencing.

Now, under the approach that the parties have accepted to proceed with the sentencing on the 24 docket case, the objection that was raised to the failure to apply the acceptance of responsibility credit is moot as the credit would apply on an ungrouped analysis, and the Court will apply that here. To be clear, I'm not considering any statements of fact in the presentence report concerning the alleged criminal conduct related to the 23 CR 10 action in connection with the present sentencing.

On that basis, is there any objection to my adopting the presentence report?

MR. BURNETT: Not from the government.

MR. TALKIN: No, your Honor, with the understanding of the amended guideline range.

THE COURT: The Court will adopt the presentence report and the factual findings therein subject to the

qualifications that I've expressed here on the record. It will be made part of the record on this matter and placed under seal. If an appeal is taken, counsel on appeal may have access to the sealed report without further application to the Court.

I'm now going to go through the guidelines calculation. The Court has independently calculated the applicable guidelines range and agrees the offense level is 28 and the Criminal History Category of I is correct, assuming that the government agrees that the additional one point decrease is warranted under 3E1.1(b).

MR. BURNETT: Yes, your Honor.

THE COURT: Does the government move for that? Okay.

This produces an advisory guidelines range of 78 to 97 months of imprisonment.

I don't see a bases for a departure here. I understand that the parties will be arguing about whether a variance is warranted in this case.

With that being said, are there any guidelines arguments that I have not addressed?

MR. BURNETT: No, your Honor.

MR. TALKIN: No, your Honor.

THE COURT: All right. So we'll move to final statements.

At this time, does the government wish to make a final statement?

MR. BURNETT: Yes, briefly, your Honor. I think the victim statements that the government submitted earlier this week are helpful for thinking about the case, because I know it's not something -- obviously we had a full trial, and other issues. It hasn't been as front of mind here. But, obviously, this is an issue that is very much front of mind to the individuals who are in the images and the videos that Mr. Eisenberg possessed, and has been in their mind and will be for the future. And it's because it has a continuing harm on those victims.

The Court just heard from a small sample of them, but as you know from the papers, there were I think over 1200 images on Mr. Eisenberg's devices gathered over the course of a number of years. Obviously, Mr. Eisenberg does not, to the government's knowledge, have any role in creating or distributing those images. The plea was for the receipt of those images and him possessing them. But I think the language from Congress and much of the case law that we cited in our sentencing submission is helpful for sort of keeping in mind that kind of that, by itself, is important, and does impart harm to victims, because it creates a market for these types of materials that otherwise wouldn't exist.

The reason these victims keep having their images appear over and over again is because there are folks that will download them, and that's because these harms will perpetuate

into the future. So I think it is -- while I know it's not been the focus of the conversation among the parties and the Court in the course of this case, I do think, when thinking about sentencing, it is important to keep in mind that while it hasn't been front and center here, it certainly is front and center for them. And that this is conduct that took place over an extensive period of time, with a large number of images, and that should, I think, weigh heavily in the Court's sentence in this case.

THE COURT: All right. Thank you.

Mr. Burnett, just one question, which is, in your letter to the Court, you recommend a total term of 78 to 97 months imprisonment for both cases, and you request that the Court indicate that, as to the child pornography charges in the 24 docket case, that I indicate that it's within or below the guidelines range for purposes of the appeal waiver and the plea agreement. Has the government thought about, in its own estimation, what portion of the recommended sentence would be attributable to the 24 docket case?

MR. BURNETT: So, candidly, we hadn't discussed it internally about how to apportion, as between the two of them. I think the way we were envisioning it is that there would be a sentence of years that would be appropriate for the Mango Markets piece of the case. So I think at least, you know, drafting the recommendation to the Court, what we were

envisioning was that the recommendation -- or the piece that would be assigned to the child pornography offense would be less than the 78 months. Whether that was less by a year or less by two years, it's a little hard to say, because we weren't parsing it that finally, but I think what we were envisioning is that that was kind of why we were getting to a total mix that was in the 78 to 97 months range.

THE COURT: All right. Thank you.

Does the defense wish to be heard?

MR. TALKIN: Yes, your Honor.

Since it's crowded, I'll go to the podium.

THE COURT: That's fine.

MR. TALKIN: Your Honor, there's no question that the charges we're dealing with today are serious charges, but, in order to understand how Mr. Eisenberg got there, how he was the individual that committed and pled to those and accepted responsibility for those charges, it's important to look into his upbringing, and some of the conditions he suffers from, and some of the things that happened to him.

And, honestly, your Honor, it's very difficult for me to stand in a courtroom in front of a lot of people and talk about this, and I'm sure for Mr. Eisenberg that's not easy, and for his family, and for many of the people that are here in his support. But it's important enough that it has to be done.

And the first thing -- and we went through this, and I

will not repeat our sentencing memorandum, but we went through this in a lot of detail in our sentencing memorandum for just this reason. He had an upbringing that was traditional in his community, but not traditional in the community of this country. And within that upbringing, there's certain social mores and things that happen that, in the intermingling among the sexes, and the attitude toward sex, and the attitude towards self gratification, all of those things are treated very differently and very harshly in society as a whole.

And the result of that, unfortunately, is a repression, an immaturity, and a lack of understanding of a lot of the fundamental things that many people understand regarding sex. Where he ended up was in a situation -- while under that influence, he was unfortunately placed in at least two situations that we know of where he was the subject of pretty much unthinkable -- the recipient of unthinkable activity, and all of that combined together is part of what led him to where he is.

But the other problem that he was dealing with is his inability, just in general, to deal with individuals and others socially in a normal fashion. Part of that is the upbringing. Part of that is the diagnosed condition that we talked about in our paperwork. And part of that is just him, from spending a lot of time with him in a small room in a jail for many years now, understanding him, and seeing how he deals with people.

But, out of all of that, and what's come from this case, and what he articulated to you in his letter, and probably, in my opinion, the most positive part of this entire experience he's gone through, is that he's had the opportunity, through this case, through this arrest, through this prosecution, and, amazingly, through the process he went through with Dr. Bardey and Fifth Avenue Forensics, to gain an understanding about the conduct that he pled guilty to, to understand that there are -- even though it's on a screen and it doesn't seem real, there's real people behind that. And to understand that they -- those individuals suffer.

And we had a moment today that really brought it all to a forefront, or to a conclusion, I'm not really sure. But it was a moment when last night or two nights ago the government gave us those victim impact statements. And, you know, as is my obligation, I went to talk to him about them, and much to my surprise, he wanted to hear them. And the reason he wanted to hear them was because he has gained an understanding of what he did here, and he wanted himself to have to hear from the people that he didn't even think about when he committed this crime. To me, that shows me how far he's come in understanding that the conduct he did is wrong.

I think he, in his own way, in his letter to you, he expressed that, but what happened earlier today really crystallized that. And why that's important is because you're

going to decide a couple things: One, what's an appropriate punish, and, in deciding that, you know, is he a risk for recidivism. Well, Dr. Bardey doesn't seem to think he's much of a risk for recidivism, though he doesn't rule it out. And based on the development that he has done, the development that I just articulated to you, but, more importantly, the development that he articulated to you in his letter, it's very, very unlikely there will be any recidivism.

As I said in our letter, we have talked about that program in the BOP that he is willing to take, or he is willing to take the program through probation, who will be supervising him. And he will continue, A, to be monitored, but, B, to continue to understand what is expected of him, and to continue to understand how his conduct was unacceptable.

Now, he's not going to speak to you today, because, you know, the posture we were in before was you had a case where he went to trial and a case where he pled, so it's a very unusual situation, and, as a matter of fact, filing a letter is even unusual. But he and the defense team thought, as to this offense, it was very important to file a letter, no matter what.

I know you took a lot of time, I'm guessing you read it more than once, but that letter on this issue -- and we'll put all the financial crime issues to the side now -- I think demonstrated to you, portrayed an individual who's ready to

move on from these offenses.

When you take that situation, those particular history and characteristics of Avi, and now you talk about the time he has spent at the MDC -- he started out at Essex, which is no picnic, but the MDC, as your Honor rightfully said, you're well aware of the horrors. But one of the things that's starting to happen in this courthouse and across the river is that people are becoming -- it's so pervasive, so terrible that people are becoming desensitized, and there's been an opinion in this courthouse that I flagged for your Honor, and the government brought up in their sentencing memo about conditions. And it talks about "they're not so bad anymore," and I'm here to tell you whatever information that's based on is incorrect.

I can tell you that not as Avi's lawyer but as somebody who is in that jail two to three times a week. I see how the defendants are treated. It's abusive. I see how, when the family visits, how they're treated. It's abusive. I feel how we're treated when we go to visit, it's abusive. And that's what's out in the public for everyone to see. But what I also know is when I -- one of the things I ask every one of my clients, whether they've been extradited from Europe, whether they've been in upstate New York jails, jails in other states, or Rikers Island, I always say, "how does this place compare." And it's not 99 percent, it's 100 percent, they all say this is the worst place they've ever been.

This isn't ancient history. This is this week I've had that discussion. I've had people say, give me more time; just get me the heck out of here. I see broken people every day that are broken by the MDC. So it cannot be stated enough how much that the people who prepared these guidelines, the people, the judges that are meting out sentences, have to -- did not take into account, without knowing how harsh those conditions are.

We throw around -- it's actually through catchphrase, harsh conditions, harsh conditions. There's so much more behind them. And Mr. Eisenberg has lived through it for closing in on I believe 20 months. Now, look, he's there by his own actions, that's for sure. He takes responsibility for those. He's pled guilty to those in this case. But nobody should have to go through that inhuman treatment.

And the reason I'm bringing that up here for you, your Honor, is, as you said, you're aware of the conditions, and that is a personal history and characteristic that warrants a downward variance and a large one, because an individual that is in another facility, whether a camp, or even a low or a medium, is not going to go through what Mr. Eisenberg has gone through.

The last point I want to make on that: Everything I just said, imagine going through that as an individual -- as a mentally strong person, an individual ready to cope socially.

Imagine going through that with the condition he has and how much more that exacerbates the horrors that he's had to endure.

So, when you take that in combination with his personal history, characteristics of his development, of how he got to where he is, and you combine those with what he's learned since and where he is, and the confidence you can have with him going out in the future and not recidivating, this is a case where 3553(a) warrants a sentence of no more than 36 months.

He has been in for a long time on this, and we understand we have a whole other issue to deal with, and that's out there. That sentence serves all of the goals of 3553(a). It serves specific deterrence. It serves general deterrence, which the government talks about. General deterrence that was probably satisfied the moment he was arrested in this case. But does general deterrence increase after one year in jail, two years in jail, three years in jail? No. The studies say no and logic says no.

If you know you do this, you're going to get arrested, you're going to go to jail, that's the general deterrent. That goal is satisfied. The guidelines themselves, as we wrote in our sentencing memorandum, are very high in these types of cases, all these types of cases, my opinion is because these were written before the advent of really a computer, of the understanding of how computers are going to be the vehicle to

commit this crime.

There's an enhancement for using a computer, which seems archaic, if not ridiculous, but there's also just the number, you know, as the government talked about, rightfully so, about the number of imagines. Things are downloaded en mass now. Not every image is looked at or used or whatever, but they are downloaded en mass, and individuals are subject to that enhancement, and the guidelines come out very high.

I think the government recognizes that in their sentencing recommendation to a certain extent, but, more importantly, the Second Circuit has recognized that, even saying in numerous cases that these guidelines for this crime are archaic, and they just don't seem to be applicable to the real world that we live in today.

That's the final piece as you decide whether to vary below the guidelines. However -- but, when it's time to sentence him on this, your Honor, I'm asking you to take into account what I just said to you. And when you put them together, the upbringing, the abuse, the time in jail, the lack of understanding, and then, most importantly, the metamorphosis into an individual that totally understands, I think the sentence that I ask for is fair and just and satisfies all the goals of sentencing.

THE COURT: All right. Thank you, Mr. Talkin.

I understand that Mr. Eisenberg is electing not to

speak, which is his right, and that's perfectly fine.

Is there anyone else from your side that wants to be heard?

MR. TALKIN: No, thank you.

MR. BURNETT: So one thing, your Honor. I think Mr. Talkin may have put this in their sentencing submission. I'm forgetting the footnote now. But during the plea on the child pornography offense, I think the Court, in reciting the statutory maximum term of supervised release, had said three years, instead of five years I think is what it is.

My understanding is that that would not make a difference to whether Mr. Eisenberg would or would not have accepted the plea here, but the government's request would be just to confirm that with Mr. Eisenberg before the Court proceeds to sentencing.

THE COURT: All right. Let me ask Mr. Talkin first.

The government has indicated, when we had the guilty plea, there was an error by the Court as to the term of supervised release that would apply to the offense of conviction, that I said three years, as opposed to five years. The government proposes that I essentially allocute Mr. Eisenberg to confirm that he understands the difference, and, despite the difference, would he like to proceed and not make an application to withdraw his guilty plea.

Now, is that your understanding, and is Mr. Eisenberg

prepared to have that questioning?

MR. TALKIN: Two things, your Honor: First of all, the error is ultimately made by the Court, but it was initially my error. That was also the supervised release in the plea, plea agreement. So there was a little bit of error.

THE COURT: That's okay. I can take the heat.

MR. TALKIN: I understand. I just want to be fair.

Secondly, I believe -- and probation can correct me -- it's actually -- it was a maximum of three, and now it becomes a mandatory minimum of five. I just want to doublecheck that. That's my --

THE COURT: That's my understanding.

MR. TALKIN: All right. As long as that -- we're asking you to give him five, as far as when you actually pronounce it.

But, as the third point and the most important point, my understanding is that would not change that he -- that Mr. Eisenberg wants to take the plea and that he wishes to accept responsibility. And I assume -- it seems you want to allocute on that. We don't have any objection to that.

THE COURT: Would you like to discuss that with Mr. Eisenberg, or had you already discussed that?

MR. TALKIN: We have discussed it, but I will take another minute just to doublecheck.

THE COURT: Okay.

(Defense counsel conferred with defendant)

THE COURT: All right. Are you prepared to proceed, Mr. Talkin?

MR. TALKIN: Yes. Thank you, your Honor.

THE COURT: Mr. Eisenberg, I want to make sure you understand what the parties have been talking about. So, in your plea agreement, and when we had your guilty plea here in court, we discussed that the term of supervised release that would apply on the offense of conviction was three years, but it is a mandatory minimum of five years.

Do you understand that?

THE DEFENDANT: Yes, your Honor.

THE COURT: Now, despite -- you now know that, so the request from Mr. Talkin is that I impose a term of five years.

Do you understand that?

THE DEFENDANT: Yes, your Honor.

THE COURT: Knowing that, you wish to continue with your plea of guilty, and to proceed to sentencing at this time?

THE DEFENDANT: Yes, your Honor.

THE COURT: Okay.

MR. BURNETT: Just one more very technical point, your Honor.

THE COURT: Give it to me.

MR. BURNETT: Under Rule 32 I guess it's (I)(3) -- I'm sorry, it's (I)(4)(iii), just, if Mr. Eisenberg wishes not to

speak at sentencing, I think you need to ask him directly. I have no doubt he will confirm what Mr. Talkin said, but just to make sure that we've done this appropriately.

THE COURT: Mr. Eisenberg, do you wish to be heard at this time?

You do not need to say anything, but if you would like to say something, I'm here to hear you out.

THE DEFENDANT: No. Thank you, your Honor.

THE COURT: All right. Mr. Burnett, anything else?

MR. BURNETT: No. Thank you.

THE COURT: All right. Mr. Talkin?

MR. TALKIN: No.

THE COURT: Anything further before we proceed to sentencing?

MR. BURNETT: No. Thank you.

THE COURT: I'm going to take a brief recess, meaning like two minutes, and I'll be back.

(Recess taken)

THE COURT: Please have a seat.

Mr. Burnett, is there any reason why I can't recite anything from the victim statements without referring to the actual names?

MR. BURNETT: No. No reason.

THE COURT: All right. After calculating the guidelines and potential departures, and hearing argument, I

must now consider the relevant factors set out in 18, U.S.C., section 3553(a) and ensure that I impose a sentence sufficient but not greater than necessary to comply with the purposes of sentencing.

Mr. Eisenberg is 29 years old. He has no prior criminal history. As the materials note, he was diagnosed with autism spectrum disorder and ADHD as a child. He has strong family ties.

As Mr. Talkin noted, he had a difficult upbringing in many ways. He has, as Dr. Bardey notes, significant psychological trauma, and he has made efforts to address those issues, as Mr. Talkin had noted.

On the other hand, the charged offense is serious. Mr. Eisenberg possessed 1,274 pieces of child sexual abuse material collected during an extended time period, 2017 through 2022. From Dr. Bardey's report, submitted by the defense, after review of the files, several videos and images show prepubescent boys tied up, crying, in visible distress, and being beaten. Some of this content includes the use of ropes and sex toys. At least one video depicted a deceased, mutilated, naked prepubescent boy. Although most of the content depicted prepubescent children between approximately six and 12 years old, there were several images and videos of children approximately zero to two years old.

An incarceratory sentence is required by the

seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense. It's also needed to promote deterrence, especially given the nature of the charges.

While I hear Mr. Talkin on the issue concerning general deterrence, I think that, in this specific area, general deterrence has more weight than it might otherwise have, because, as is reflected in the victims' statements, and as is reflected in the literature and the materials that have been submitted, this is an incredibly difficult to detect crime. These images are distributed through the internet. It is often impossible for investigators to find the extent which these images have traveled. The only way to try to stem the tide of distribution of this material is to make sure that when sentences are imposed, they are sentences that reflect appropriately the seriousness of the offense.

The Court must also consider the other criteria in the statute, including the kind of sentences available, the guidelines, and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. Along these lines, the Court has considered Mr. Eisenberg's arguments based on *United States v. Dorvee*, 616 F.3d 174 (2nd Cir. 2010). There's a lot in *Dorvee* that, consistent with Mr. Talkin's arguments, councils for potential variance from the guidelines range here.

The Court has also considered available data concerning sentencing for individuals in comparable situations as Mr. Eisenberg. Now, there's a limit to what you can read from the data, because the available data to the courts and to the parties is extremely limited, which is a separate issue that should be resolved by the Sentencing Commission. The data is out there, and it cannot be easily accessed, but what we have is some information about averages and medians.

So I'll just tell you what information I have, to the extent that it's relevant in trying to avoid disparities. For defendants convicted under 18, U.S.C., section 2252(a), subsection (a)(5)(B) -- that doesn't include -- or just include people who are also convicted under (b)(2) -- with the sentencing guidelines range of 78 to 97 months, and a Criminal History Category score of I, and in the same age range of 21 to 30, the average length of imprisonment imposed was 49 months and the median sentence was 48 months. However, the sentences varied widely, from one day to 120 months.

In cases where the Court varied or departed from the guidelines range not at the request of the government, the average length of imprisonment was 43 months and the median was 48 months, although sentences ranged from one day to 75 months.

Limited to solely defendants who are 29 years old on the date of sentencing, there are 11 cases meeting that criteria, and the average length of imprisonment was 46 months,

and the median, 48 months.

The Court has also considered the victims of Mr. Eisenberg's offense. In *United States v. Miller*, 665 F.3d 114 (5th Cir. 2011), the Court addressed *Dorvee* and noted the district court in that case's rejection of the argument that, in effect, child pornography offenses necessarily inflict lesser harm than a physical encounter with a child. The district court there observed, "every image of a child, every image of a non-adult engaged in any type of sexual activity constitutes an additional case of victimizing a child. Without a demand for that type of information, and that type of viewing from persons like this defendant, we don't know how many child abuse cases we could prevent. And as long as there is a demand to purchase images of child pornography; there is going to be an unending stream of child abuse of people, children who are forced into these roles."

The circumstances of *Miller* were different than this case, but the general principle that there are real victims in cases like these is sound and I think accepted by both the government and the defense in this case.

The Court has further considered some of the victims of Mr. Eisenberg's own criminal conduct, and without referencing the names, I think it's important to permit these victims to be heard as part of this sentencing. One victim was a preschool-aged little girl when her abuse began, and it

lasted for three years. The images and videos distributed online show the extreme sexual abuse of this little girl, including being sodomized, vaginally penetrated, and urinated on. Those images of her horrific abuse are traded throughout the world.

The letter goes on to say, each defendant is a participant in the cycle of the victim's abuse. She can never escape the reality that her images are being circulated online for the perverted gratification of others. With those images circulating throughout the world, she lives in fear of being recognized. She has no control over who sees her images. Each new case notification is a reminder that there is someone out there seeking pleasure from the images of her sexual abuse, and she is re-traumatized every time she is notified that her images are in the possession of another perpetrator.

Another victim, "I was only seven when my predator began molesting me and photographing me. It went on for two years before they found him on the internet sending pictures of me to men. Then they found me after arresting him, but my life has never been the same. I live my life uncomfortable with men and boys around. I am always conscious of my clothing and making sure no one can see any parts of me. I worry about the pictures of me that are out there, and I hate that others see them. It has been so hard to trust anyone, even family and friends sometimes, since he did those things to me. I went to

therapy for a while, but I stopped because I just wanted to forget it. With all the pictures out there, I still can't."

Another victim, "I was just a toddler when one day fate stabbed itself upon me. With the help of various child sexual abuse material, I was conveniently raped by my abuser over and over again. Based on evidence collected by law enforcement, it could possibly be determined that I was raped and sexually assaulted on a daily basis. I was between the ages of anywhere from three to six years old. And after the downloading and distribution of images, my smile, my laughter, and my innocence have all been taken from me."

(Continued on next page)

THE COURT: How I am portrayed in those pictures and videos is not how I want to be perceived. That little girl is dead.

The Court is considered all the factors under Section 3553(a)(2), I will now state the sentence that I intend to impose, but the attorneys will have a final opportunity to make legal objections before the sentence is finally imposed. In light of all the factors I've discussed, both the presentation made by the government, and also the presentation made by the defense, the statements here from Mr. Talkin, the Court imposes a sentence of 52 months of imprisonment. Mr. Talkin, is there a recommendation as to where Mr. Eisenberg will serve his sentence.

MR. TALKIN: Yes, we'll ask for FCI Otisville.

THE COURT: The Court will make a recommendation that Mr. Eisenberg serve his time of incarceration at FCI Otisville. The defendant is to be placed on supervised release for a term of five years. The Court will impose the mandatory standard and special conditions of supervised release exactly as they are stated in the presentence report.

Mr. Talkin, do you wish that I read the conditions out loud in court?

MR. TALKIN: No, your Honor.

THE COURT: All right. Now as to the special conditions, the Court has reviewed the special conditions. And

as to the search condition, that is justified under the 3553(a) factors given the offense in question, possession of child pornography; that is true as well as to the evaluation and outpatient offender condition; that is true as well as to the condition relating to the installation of software allowing the probation office to monitor activity; that is also true as to the condition relating to the restrictions on viewing any sexually explicit material.

And as to the condition relating to participation in outpatient treatment program approved by the probation office, that is justified given the history of marijuana and stimulant abuse. As to the other conditions relating to financial information and lines of credit, those are warranted given the restitution obligations and forfeiture obligations that are associated with the offense of conviction.

I'm going to stop there for a moment. Mr. Talkin, do you have any questions about the conditions?

MR. TALKIN: I don't. Well, I'll wait to the end. I have a couple of requests.

THE COURT: Of course. As to the fine. As I understand it, there's no application for a fine relating to the '24 conviction. Is that correct, Mr. Burnett.

MR. BURNETT: That's correct. We make a request on page 44 of the PSR of the assessments.

THE COURT: I'll get to that. All right. So there's

no fine here. As to restitution, I have a consent order of restitution that has been signed by Mr. Burnett, Mr. Eisenberg and Mr. Talkin dated May 1, 2025, so today.

And Mr. Eisenberg, did you see this consent order of restitution today?

THE DEFENDANT: Yes.

THE COURT: And did you review it before you signed it?

THE DEFENDANT: Yes, your Honor.

THE COURT: Did you discuss this order with your attorneys?

THE DEFENDANT: Yes, your Honor.

THE COURT: All right. And did you understand this order before you signed it?

THE DEFENDANT: Yes, your Honor.

THE COURT: At this time I'll sign the consent order, and it will be made part of the judgment in this case. As for forfeiture. Pursuant to 18 U.S.C. Section 2253, any and all property real and personal constituting or traceable to gross profits or other proceeds obtained from the offense, and any and all property real or personal used or intended to be used to commit or promote the commission of the offense or traceable to such property; including but not limited to a sum of money in U.S. currency representing the amount of proceeds traceable to the commission of the offense will be subject to forfeiture.

There's a special assessment of $100. As well there is a $5,000 assessment under 18 U.S.C. Section 3014, and a $17,000 assessment under Section 2259(a). Let me stop there.

Now, anything else, Mr. Burnett, in terms of the sentence?

MR. BURNETT: No, thank you.

MR. TALKIN: Your Honor, I'm going to ask you to hold off on the recommendation, if you allow me to file a letter tomorrow asking for a recommendation. With it broken up, I needed to figure out -- I'm not sure how getting two judgments and that will affect the recommendation, and more importantly, the sentencing -- excuse me, the time can affect where he's eligible for not, as well as the programs. I'm prepared to ask your Honor to recommend the RDAP program. But the other program that I talked about in my papers, that has a lot to do with the length of the sentence. So I have to do a little research about whether it makes sense to do that or just ask for the same type of program generally as opposed to that specific program.

THE COURT: All right. Get me the letter and I'll make the recommendation that you want.

MR. TALKIN: Thank you.

THE COURT: Do either counsel know of any legal reason other than those already argued why the sentence should not be imposed as stated, Mr. Burnett?

MR. BURNETT: No, your Honor.

THE COURT: Mr. Talkin?

MR. TALKIN: No, your Honor.

THE COURT: I order the sentence be imposed as stated subject to the recommendation that I'll receive from Mr. Talkin. There are no open counts in the information in 24CR251. Is that correct, Mr. Burnett?

MR. BURNETT: That's correct.

THE COURT: Mr. Eisenberg, to the extent you have not given up the right to appeal your sentence through your plea of guilty and the agreement you entered with the government in connection with that plea, you have the right to appeal your sentence. If you are unable to pay the cost of an appeal, you may apply for leave to appeal *in forma pauperis*. You may also apply for court-appointed counsel. A notice of appeal must be filed within 14 days of the judgment of conviction.

And to both sides, are there any other objection that you have that I have not addressed, Mr. Burnett?

MR. BURNETT: No. Thank you.

THE COURT: Mr. Talkin?

MR. TALKIN: No, your Honor.

THE COURT: Anything else that either side wishes to raise?

MR. BURNETT: No.

THE COURT: All right. So, Mr. Eisenberg, I was moved

by Mr. Talkin's statements about your recent efforts to repair what's been done. Both to yourself in the way that you interact with others and your conduct moving forward, and also in the way that you perceive the conduct that's at issue here and your understanding that there are real victims here. And so I want you to understand that that is exactly what you're supposed to be doing, helping to repair the world. And you are part of that and you're going to continue to do that and I have faith that you will do that.

And this is, while it might seem like a sentence, a dark tunnel that you're going to have to go through, it is the beginning. It is not the end. And if you need any reminder of what you have to look forward to, it's in the letters that Court has read multiple times, including from your mother who says that Avi has always been the pride and joy of my life. From your father who said, Our family is incomplete without him. From Leah your sister, No one can replace Avi and everything he means to me. And from your brother Manakin, The entire community awaits his return, and you will return.

Thank you. We are adjourned.

(Adjourned)